UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

ANN ALEXANDER,

                        Plaintiff,

        -against-

WESTBURY UNION FREE SCHOOL DISTRICT,
WESTBURY UNION FREE SCHOOL DISTRICT
BOARD of EDUCATION, DARNEL C. POWELL
in his former official capacity as Principal and individually,
ROBERT W. ROOT in his official capacity as Assistant
Superintendent and individually, CONSTANCE R.
CLARK-SNEAD in her official capacity as Superintendent
and individually, and CASSANDRE SPENCER in her
official capacity as Assistant Principal and individually,

                        Defendant(s).
-------------------------------------------------------------------X

**MEMORANDUM
& ORDER
CV10-0606(WDW)**

**WALL, Magistrate Judge:**

       Before the court, on consent of the parties, are three motions: (1) a motion for summary

judgment by defendant Darnel C. Powell (DE[47] & [49]); (2) a motion for summary judgment

by defendants School District, Board of Education, Root, Clark-Snead and Spencer ("the District

Defendants") (DE[55]& [57]); and (3) plaintiff's motion to amend the complaint ([DE[50-52]).

The motions for summary judgment are opposed by the plaintiff (DE[48] & [56], and the motion

to amend is opposed by the defendants (DE[51] & [53-54]).  For the reasons set forth herein,

Powell's motion for summary judgment is granted in part and denied in part; the District

defendants' motion for summary judgment is granted; and the plaintiff's motion to amend is

denied.  All claims are dismissed except those against Darnel Powell in his individual capacity

pursuant to New York State Humans Rights Law §296(1) and intentional infliction of emotional

distress.  The court will not exercise supplemental jurisdiction over those state law claims, but

Alexander may pursue them in state court if she chooses to do so.   The Clerk of the Court shall

enter judgment accordingly.

## BACKGROUND

Plaintiff Ann Alexander filed the Complaint in this action in February 2010, asserting claims based on alleged employment discrimination. She alleges (1) sexual harassment; (2) intentional infliction of emotional distress; (3) negligent infliction of emotional distress; (4) hostile work environment; and (5) respondeat superior as her causes of action. Complaint, DE[1]. Although she does not specify the statutory bases for her causes of action in those sections, aside from a reference to Title VII in her first cause of action, she does allege that the action is brought pursuant to Title VII, section 1981, the Fourteenth Amendment, and the New York Human Rights Law§296. Complaint, DE[1], ¶1. She bases subject matter jurisdiction on Title VII. *Id.* ¶2.

The facts underlying the dispute are set forth here as stated in the Complaint and in the parties' 56.1 Statements. I note that the plaintiff's counterstatements are nearly useless to the court on consideration of these motions. Many, if not most, of the defendants' factual allegations are flatly denied by the plaintiff, without any citations to evidentiary support for the denials, and often regarding facts which are fully supported by documentary evidence or Alexander's own deposition testimony. In these instances, I deem the defendant's statement of fact to be admitted. *See* Local Rule 56.1(d). In the rare instances where the plaintiff interposes a viable denial of a material fact, it is noted. Not every fact set forth in the 56.1 Statements is repeated here, but only those facts necessary to a determination of the motions. I will address each of the motions separately, and begin with the facts as set forth in the District Defendants' 56.1 statement and the counterstatement on that motion. Additional facts from Powell's statement and the plaintiff's

counterstatement to his motion are addressed separately.

**Facts Underlying the District Defendants' Motion:**

Alexander began working for the Westbury School District at the middle school in 1993, and was granted tenure in 1995. She is still employed by the District at the middle school. The District adopted a sexual harassment policy in 1997, and Alexander received a copy of it in 1997 and 2002. Alexander Dep., Ex. D at 21-22, Ex. G[1]. Defendant Powell, the principal of the middle school from 2003 to 2009, also received a copy when he was hired in July 2003. Powell Dep., Ex. I at 102, Ex. H. Powell also acknowledges that he received training on the topic of sexual harassment at annual conferences. Ex. I at 102-03.

The defendants assert that Alexander had some disciplinary problems prior to the alleged harassment, but those details are irrelevant to the resolution of these motions and need not be repeated here.

The District Defendants' 56.1 Statement next moves on to the incidents of alleged harassment in 2005. Alexander denies almost all of the factual allegations, despite the fact that they are supported by her own deposition testimony, and she offers no evidentiary support at all for her denials. The facts set forth and evidenced by the defendants and deemed admitted[2] by the plaintiff's unsupported denials are as follows. *See generally* DE[55-21], ¶¶41-60, Ex. D, 27-67.

---

[1]References to exhibits in this recitation of facts are to the District Defendant's exhibits unless otherwise noted. Unfortunately, both the District Defendants and the plaintiff used letters to mark their exhibits.

[2]The facts are deemed admitted for purposes of this motion only. Nothing in this Memorandum and Order is intended to be a ruling on whether Darnell Powell did and said the things Alexander accuses him of, or whether the decision from the state §3020-a hearing has precedential effect. Those issues will be determined by the state court if Alexander brings her surviving claims against Powell in the state court.

In September 2005, Powell approached Alexander at a school dance and invited her to have lunch with him the following Monday. Alexander at first ignored his invitation, but later agreed to the lunch but did not show up for it. Powell did not comment on her failure to appear for lunch and did not repeat the invitation until approximately December 2008. After September 2005, Powell allegedly called Alexander into his office occasionally for meetings, at which he would tell Alexander about complaints made against her by parents or students, but not identifying the complainants. Alexander admits that Powell had no obligation to identify the complainant and that she did not ask the union if he was required to do so. She received no disciplinary notices about the alleged complaints. When Alexander got up to leave the room, Powell would reach out to embrace and kiss her. (Alexander admits this.) She turned her face so that the kisses landed on her cheek, and Powell never kissed her on the lips. At one meeting, Powell allegedly told Alexander that he had been interested in her years before, as "a young boy," but now that he was a "damn ass grown man" they could "take it out of the building." Alexander responded by gesturing toward pictures of Powell's wife and children, indicating that she was flattered, but she respected marriage. She then walked out of his office. Powell never told Alexander that he could do anything for her career if she gave in to his advances.

Alexander claims that during the 2005/06 school year Powell tried to transfer her to the MARS program, which assisted students needing extra care, for the following year. Powell helped to found the MARS program and testified that he did not view asking someone to join it as an insult, although Alexander viewed it as punishment. Alexander told him she did not want to work in the MARS program, but he told her they needed "heavy hitters" like her. Toward the end of the 2005-06 school year, Alexander went to defendant Robert Root to complain about the

proposed MARS assignment.  Root indicated he would take care of the situation, as the proposed assignment would have required Alexander to teach a number of seventh grade classes, which she was not certified for.  Alexander is certified to teach grades K-6.  Alexander says that Root handled the situation to her satisfaction.  At the time she went to Root about the MARS issue, Alexander did not mention any incidents of harassment by Powell.  Powell issued an unsatisfactory review at the end of the 2005-06 year (incorrectly pleaded as the 2006-07 school year in the Complaint), but the union got involved and the review was amended to satisfactory.

The District hired defendant Spencer as an assistant principal at the middle school for the 2006-07 school year, after Powell had sought Alexander's participation in the MARS program.  During the year, Alexander once referred to her students as "acting like a bunch of crack babies," which she admitted was an inappropriate remark that came from her frustration with students who had serious disciplinary problems.  At the end of the 2006-07 school year, Spencer gave Alexander a satisfactory summative evaluation.  Ex. R.

In September 2007, Alexander was in the middle school's crowded main office talking to a colleague when Powell interrupted and said "I'm going to get my sugar."  Powell then leaned over the counter and kissed Alexander on the cheek.  In Spring 2008, Alexander was leaving the building when Powell, who was outside the building, motioned for her to wait for him.  He asked her why she was in a hurry and she said she was on her way to class.  Powell then allegedly put his hands on Alexander's shoulders, looked at her, and said "You are going to give me some."  Alexander asked, "some of what?" and he answered "You know what."  He then walked away and said they would discuss it another time.

In August 2008 Alexander saw Powell in the school parking lot and he asked her if she

had ever hear of or been to "Hedonism." She had not heard of Hedonism at the time, but now believes it to be "a place in Jamaica where you go for free sex." Powell told her he had been there and if she ever went she should think of him. As Alexander walked to her car, Powell followed her and asked if he could drive her car. She told him he could drive it around the block. Powell said he wanted Alexander in the car and asked when she was going to "fuck him." Alexander was shocked and asked Powell how his wife and daughters were doing. He said they were "fine." She told him to have a good summer, got in her car and drove away. When these events allegedly occurred, Alexander had not yet complained to any District Board members, administrators or supervisors about any inappropriate behavior by Powell to her. Nor did she report this incident to any District administrators or union representatives until November 2008. Alexander says that she had not complained prior to August 2008 because she was afraid she would be transferred to a first or second grade class, but the record also reflects that she told union president Michael Burger that she did not come forth sooner because, as an African American female, she did not want to see the reputation of an African American male, Powell, tarnished. DE-55-21], Def. 56.1 Stmt., ¶¶139-40; Burger Dep, Ex. JJ, at 70-71 & 79.

Alexander was observed in her classroom in November 2008 by Christie Thiel, a new Department Chairperson. The parties disagree on details of whether Powell had directed Michelle Peterson, the new English Language Arts Director to whom Thiel reported, to observe Alexander and give her a bad evaluation, whether Powell had told Thiel to do the observation, and whether Thiel had orally reported to Alexander that her performance was satisfactory. Thiel has submitted an affidavit in support of the District Defendants' motion, and she swears that she was never directed to give Alexander a negative performance evaluation, that she was asked by

Peterson to observe Alexander, that she observed Alexander in November 2008 and had "various concerns with Ms. Alexander's performance" at that time. Ex. T, Thiel Aff., ¶¶3-7. Saying that she was not "anxious to have a confrontation with Ms. Alexander," she went to Powell when she considered giving an unsatisfactory rating. She reports that Powell told her not to write up the report, as he wanted to give Alexander another chance. Thiel believes that Powell then asked Peterson to do the evaluation. Alexander continually asked Thiel for a written report of the observation, and Thiel completed the report in response to Alexander's demands. *See* Ex. U. Thiel checked the satisfactory box, based upon her "understanding that Ms. Alexander would be getting reviewed again." *Id.* ¶¶8-12. She concludes by saying that she is "unaware of any directive from anyone to issue a negative performance evaluation to Ms. Alexander" and that she never told anyone that there had been such a directive. *Id.* ¶13. Although Alexander disputes a number of these details, she has pointed to no sworn testimony or other evidence that supports her position. I do note, however, that Alexander states that Thiel finally wrote up the report because Alexander went to the union president, who phoned defendant Root, who phoned Powell and told him the report had to be in writing. DE[56-15], ¶124.

Michelle Peterson has also submitted an affidavit. Ex. S. She states that Powell never told her to give Alexander a negative performance evaluation. She did ask Thiel to conduct the Alexander evaluation. Peterson was later told by Powell to conduct another observation of Alexander. Powell told her that Thiel had some concerns about Alexander's performance, but he wanted to give her a second chance. Peterson observed Alexander in January 2009 and issued a satisfactory performance rating. *See* Ex. V. She states that she is unaware of any directive from anyone to issue a negative performance evaluation to Alexander, and thus never told anyone

there was such a directive. As with Thiel, although Alexander disputes a number of Peterson's claims, she has pointed to no sworn testimony or other evidence that supports her position.

In November 2008, District guidance counselor Lisa Maldonado told her union representative that she had been sexually harassed by Powell. The union rep reported the allegation to Root, who was the District's Title IX officer from 2003 to 2010. Root met with Maldonado and investigated. Powell denied the allegations. Root issued a memo on December 2, 2008 that concluded that both sides seemed credible and that an outside investigator should be retained. Ex. Y. Root's memo also recommended that Maldonado be assigned to report to the assistant principals and Powell be directed to avoid direct contact with Maldonado. *Id.* The defendants say that by the time the union asked for an outside investigator, defendant Clark-Snead had already decided to retain one. After Maldonado's complaint, Alexander told union president Michael Burger that she too had been sexually harassed by Powell. Burger asked Alexander why she had not come forward sooner and, as noted earlier, Burger reports that Alexander said that she did not want to see an African-American male (Powell) have his name tarnished. Alexander says that she was also afraid of being transferred.

The District hired attorney Bronwyn Black to conduct an investigation. Black interviewed a number of people, including Alexander and Powell, and concluded that Maldonado's and Alexander's allegations were more credible than Powell's denials. The defendants say that she recommended that the District follow the proper procedures for matters in which there is a finding of sexual harassment. *See* Black memo, Ex. Z at 36. Alexander sets forth a lengthy denial of this in her 56.1 counterstatement, but without any evidentiary notation or support. The gist of her "denial" is that Black found Powell to be guilty of sexual harassment.

*See* DE[156-15], ¶144.

In February 2009, the District suspended Powell and brought disciplinary charges against him pursuant to New York Education Law §3020-a. While Powell was suspended, a supplemental investigation was conducted and a supplemental memo issued by Black. Ex. AA. The outcome was the same. Powell never returned to work for the District, and the 3020-a hearing officer ultimately believed that Powell had committed the acts alleged. The District adopted the hearing officer's findings and terminated Powell's employment. Alexander has testified that she has not been sexually harassed by anyone in the District since Powell left.

Before the 2006-07 school year, Alexander had asked Powell if she could start teaching Academic Intervention Services ("AIS") classes, which involved the provision of additional services to students needing extra help in math or reading. Powell granted the request and Alexander began teaching AIS classes. Alexander continued to teach AIS classes in the 2007-08 and 2008-09 school years. In or about March or April of 2009, the District Defendants report, there arose a need to transfer a teacher named Michael Marrin. Defendant Root believed that a three-way transfer, which would involve a teacher named Carol Clark moving from an elementary school to the middle school, Marrin moving from one elementary school to another, and Alexander replacing Marrin at the elementary school he would be leaving, was indicated. Root and Clark-Snead both say that they thought Alexander would be a good fit at the elementary school and deny that the transfer was related to Alexander's complaints about Powell. By letters dated April 7, 2009, the District notified the three teachers of the impending transfers. Ex. BB. Alexander complained, and the District rescinded the transfers in June 2009. Ex. DD. Alexander had served a Notice of Claim on the District in May 2009. Alexander says that her

transfer was rescinded after the EEOC investigated and decided to sue for retaliation. She also notes that transfer should be made utilizing non-tenured personnel first, and that when she asked Root why she was being transferred, he told her it was because of "personnel issues." DE[56-15], Pl. 56.1 Stmt., ¶162. In any event, Alexander never worked a day outside the middle school, and did not lose any seniority, salary, or benefits due to the planned transfer. Spencer sat in on the meeting at which Root advised Alexander of her transfer, but played no role in the transfer decision. In the Complaint and at her deposition, Alexander stated that the assignment to an elementary school was "less desirable." Alexander Dep., Ex. D, 147:22-148:13.

Alexander testified that the transfer was part of a plot by defendant Clark-Snead to set her up for failure. She also testified that Clark-Snead explained her transfer by saying that Alexander was one of the best teachers the school had, and that if she taught the younger children, they would not need AIS services by the time they got to middle school. Alexander received a satisfactory evaluation from then acting-principal Dennis Hinson and Christie Thiel in June 2009.

Alexander contends that defendant Spencer told a group of high school girls in June 2009 that Alexander was transferred because she lied abut Powell. Alexander says she and Maldonado heard this from a parent. At her deposition, Spencer denied making such a comment. During the course of the 2009-10 school year, Spencer sent memos to Alexander which she did not consider harassing, but that Alexander "took issue with." Alexander Dep., Ex. D, 190.

During the 2009-10 school year, a situation arose involving a student identified as R.S. At her deposition, Alexander testified that she had given R.S. an assignment that he had not handed in, so she gave him a zero on it. She reports that the child's parent spoke with Alexander

at open school night, and was very frustrated with her child and very upset, and that Alexander did not want to speak with her when she was in that frame of mind. Alexander and the parent met with Spencer on December 11, 2009 and a plan was devised to monitor what R.S. handed in to Alexander. On December 17, Spencer sent a memo to Alexander regarding the meeting, noting that the parent had complained that Alexander had not previously advised her about the missed homework and poor grades. Ex. EE. The memo also indicated that Alexander had said that it was "impossible to maintain paperwork." Alexander denies this and refers to a letter she wrote to Spencer, but she does not cite to any exhibit or any testimony to support her denial. Alexander says that Spencer mischaracterized the meeting and the memo caused Alexander to have heart palpitations for which she went to the nurse's office. Alexander received a satisfactory summative evaluation at the end of the school year, and the R.S. incident was not mentioned in it. Alexander says that is because she had filed the lawsuit.

Another incident occurred in the 2009-10 school year, involving a student called A.M., whose parent complained to Spencer that Alexander had intimidated A.M. in the classroom. Spencer, Alexander and A.M.'s parent met on December 9, 2009. In a memo issued by Spencer on December 14, 2009, Spencer recounted the parent's complaint that A.M. was fearful of answering questions in the classroom because when they answered incorrectly, they were ridiculed by other students and Alexander did not admonish those students. Ex. GG. Alexander "took issue" with Spencer's characterization of the incident and the meeting. On February 11, 2010, Alexander filed her Complaint in this action.

On March 23, 2010, Alexander wore jeans to works and was told by Principal Hinton to go home and change. Alexander told Hinton that she could not get into her house because the

garage door was broken so she was allowed to remain at school. Alexander maintained at her deposition that many other teachers wore jeans and were not humiliated as she was. That same day, Spencer issued a memo to Alexander reminding her of proper procedures for sending students out of the classroom. Ex. HH. Alexander wrote on the memo that she was upset at the time from the jeans incident.

Alexander asserts a few other incidents that occurred after she filed her Notice of Claim and the complaint in this lawsuit. Alexander alleges that her students were improperly excluded from participation in a spelling bee. On May 21, 2010, Alexander wrote to Thiel asking why she had not been informed about the spelling bee. Ex. II. Thiel responded by email on May 24, 2010 that the spelling bee coordinator had distributed the list of spelling words to the ELA teachers and that he had not given a list to Alexander initially because he mistakenly believed that Alexander taught only AIS and not ELA classes. *Id*. The spelling bee coordinator put a list of the words into Alexander's mailbox.

Another complaint involves Powell's §3020-a proceeding. Root told Alexander that she would have to testify at it, but Alexander said that her attorney was away at that time. Root told her that if she did not appear, she would be subpoenaed. The District did serve a subpoena and Alexander had her own attorney present when she testified at the hearing.

Alexander contends that the District ignored previous incidents involving Powell, notably an incident in 2005 involving a District teacher named Sheila Scott-Powell[3]. During the 2004-05 school year, Powell had told several administrators that he was unhappy with Scott-Powell's

---

[3]This teacher's name is occasionally spelled in the plaintiff's papers as Shiela or as Scot-Powell. I do not know which spellings are correct, but will use the defendants' spellings, as she was employed by them and their spellings are the common ones for those names.

performance as English Department chair. The president of the union, Michael Burger, knew about the problems and originally sided with Powell, as did union vice-president Christine Corbett, who thought that Scott-Powell had been shown favoritism by some administrators. In June 2005, Powell gave Scott-Powell an unsatisfactory summative evaluation, which meant that Scott-Powell would lose her position as chair. On June 28, 2005, Scott-Powell met with Clark-Snead about the evaluation. In August 2005, Scott-Powell spoke with Burger and told him that Powell had been harassing her. Burger called Root to tell him there was a problem between Powell and Scott-Powell, but did not give specifics, and Root said that Scott-Powell should call him. She did not do so.

Scott-Powell had already met with Clark-Snead and complained about her unsatisfactory evaluation and about Powell's treatment of her. According to Clark-Snead, the emphasis by Scott-Powell at the discussion was that Powell had not treated her fairly in the end of the year evaluation, but Scott-Powell had also reported that Powell had remarked that she had "junk in the trunk" and that he could make her have a baby right now. (Scott-Powell was pregnant at the time.) Clark-Snead says that she met with Powell so that he could respond to the allegations and advised him that future complaints of this nature would be a violation of policy and that he should review the District's sexual harassment policy. She says that she was unaware of prior instances in which Powell had violated District policy. *See* DE[55-21], Def. 56.1 Stmt., ¶¶207-263. A memo dated August 18, 2005 from Clark-Snead to Scott-Powell indicates that the allegations would be passed on to Dr. Root for a Title IX report, but Root is not cc'd on the memo and denies receipt of it. Clark-Snead says, however, that she was in frequent verbal contact with Root about the matter. An August 25, 2005 memo from Clark-Snead granted Scott-

Powell an "involuntary" transfer to another school. Ex. MM. Although the transfer was termed "involuntary," the defendants say that Scott-Powell had requested a transfer, and Clark-Snead says that she granted it as "involuntary" to protect Scott-Powell's seniority in the new building. Apparently, if a teacher requests a transfer, seniority is lost, but if the transfer is involuntary, it is not. The memo stated that the District had investigated the allegations and that Scott-Powell was satisfied with the resolution. Scott-Powell signed the memo the next day, and Clark-Snead says that no one forced her to sign it.

Another incident involving Powell that Alexander says the District mishandled involved a teacher named Josephine Hall. In 2006, a student was accused of taking photographs up Ms. Hall's skirt when she stood in front of a class. Powell suspended the student for 2 days. Hall did not like the way Powell handled the situation, but made no accusations that Powell sexually harassed her. The student left the country and never returned to the District.

## DISCUSSION

**Summary Judgment Standards:**

Pursuant to Federal Rule of Civil Procedure 56(c), courts may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). At this stage, the burden of proof is on the moving party to show that there is no genuine issue of material fact. *Gallo v. Prudential Residential Services, L.P.*, 22 F.3d 1219, 1223 (2d Cir. 1994)(citing *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975)). A genuine issue of fact exists if "a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).  In

making this determination, the court must view all of the evidence "in the light most favorable"

to the non-movant.  *Breland-Starling v. Disney Publishing Worldwide*, 166 F. Supp. 2d 826, 829

(S.D.N.Y. 2001)(citing *Anderson*, 477 U.S.).  In addition, the court must resolve all ambiguities

and draw all inferences in favor of the party opposing the motion.  *Ackerman v. National*

*Financial Systems*, 81 F. Supp. 2d 434 (E.D.N.Y. 2000).  Once the moving party has met its

initial burden of demonstrating the absence of a genuine issue of material fact, the nonmoving

party must set forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P.

56; *see Liberty Lobby*, 477 U.S. at 250.

     In opposing the motion, the nonmoving party may not rely upon "mere conclusory

allegations, speculation, or conjecture."  *Ackerman*, 81 F. Supp. 2d at 436 (citing *Kulak v. City of*

*New York*, 88 F.3d 63, 71 (2d Cir. 1996)).  However, "if there is evidence in the record as to any

material fact from which an inference could be drawn in favor of the non-movant, summary

judgment is unavailable."  *Holt v. KMI Continental Inc.*, 95 F.3d 123, 129 (2d Cir. 1996).

     The Second Circuit has  indicated that trial courts should be wary of granting summary

judgment in discrimination cases since intent and state of mind are typically at issue and direct

evidence of discriminatory intent is rare.  *Tarshis v. The Riese Organization*, 195 F. Supp. 2d

518, 523-24 (S.D.N.Y. 2002); *see also Holtz v. Rockefeller & Co.,Inc.*, 258 F.3d 62, 69 (2d Cir.

2001).  Nonetheless, cases involving allegations of workplace discrimination and harassment are

still subject to summary judgment, and where the nonmovant fails to demonstrate a genuine issue

of material fact, relief may be granted against such claims.  *Holtz*, 258 F.3d at 69.

     As is routine in this Circuit, the court will treat plaintiff's claims under Title VII and the

New York State Human Rights Law "as analytically identical, applying the same standard of proof to both claims." *Dauer v. Verizon Communications, Inc*., 613 F. Supp. 2d 446 (S.D.N.Y. 2009)(quoting *Salamon v. Our Lady of Victory Hosp*., 514 F.3d 217, 226 n. 9 (2d Cir.2008) (considering sex discrimination claims)); *see also Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 609 (2d Cir. 2006) (hostile work environment and retaliation claims subject to same standards under federal and New York state law). With these standards in mind, I turn to the District Defendants' motion, noting that all findings in regard to the Title VII claims apply equally to the New York Human Rights Law claims.

## I) The District Defendants' Motion for Summary Judgment

**Plaintiff's Rule 56.1 Counterstatement:**

As noted earlier, the plaintiff has not met her obligations under Local Civil Rule 56. She has simply denied most of the defendants' factual allegations, without explanation or support. Where she does attempt to assert some explanation for her denial, she makes factual statements unsupported by any citation to the record, including her own deposition transcript. As the defendants have noted, the result of this failure is that the defendants' 56.1 statements are by and large deemed admitted. *See, e.g., Holtz,* 258 F.3d at 74; *Bank of America v. Commack Properties, LLC,* 2010 WL 5139219, *6 n.2 (E.D.N.Y. Dec. 10, 2010); *Global Vision Products, Inc. v. Pfizer, Inc.,* 2006 WL 344757, *2 (S.D.N.Y. Feb. 14, 2006). Where the plaintiff's own deposition testimony supports her version of the facts, it will be noted and considered. Otherwise, the defendants' facts are deemed admitted.

**Inconsistent Affidavit Testimony:**

The defendants also argue that the affidavit testimony by Lisa Maldonado and Michael

Burger submitted by Alexander in opposition to this motion is inconsistent with their deposition testimony and must be disregarded on this motion for summary judgment[4]. DE[57-3] at 4 (citing *Mack v. United States,* 814 F.2d 120, 124 (2d Cir. 1987) and other cases). I agree that allowing a plaintiff to create an issue of fact by submitting a statement that is contradictory to deposition testimony is unacceptable. But there are further problems with the statements as well. Both the Maldonado and Burger statements are captioned as Declarations, not affidavits. *See* Pl. Exs. S & T. But they do not have the language required by 28 U.S.C. §1746 that their statements are made under penalty of perjury and thus they cannot be considered as declarations. While they are captioned as declarations and not as affidavits, they do have a notary signature stating that they were "sworn to . . ." Rather than wasting time on a determination of whether that notary signature is sufficient to qualify the documents as affidavits, I will accept them as such for the purposes of this motion and move on to the additional problems in their content rather than form.

Aside from the defendants' claim that the statements contradict earlier sworn testimony, parts of the statements merely report hearsay and are not based on personal knowledge. Thus, even if such statements are consistent with prior sworn statements, they cannot be considered on this motion for summary judgment. "An affidavit or a declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ.

---

[4]The defendants note that although plaintiff's counsel's declaration refers to an affidavit from the plaintiff in opposition to the motion, no such affidavit was served. A "declaration" by Alexander is, however, annexed as Exhibit U to the Dilimetin Declaration. Like the Burger and Maldonado "declarations," it does not include the requisite language regarding the penalties of perjury, but it does include a notary's stamp.

P. 56 (c)(4). These standards will be applied to the documents when they are discussed *infra*.

**No Individual Liability Under Title VII:**

It is well settled that individuals are not subject to liability under Title VII and that Alexander's Title VII claims against the individual defendants must be dismissed as a matter of law. *See Patterson v. County of Oneida,* 375 F.3d 206, 221 (2d Cir. 2004); *Mandell v. County of Suffolk,* 316 F.3d 368, 377 (2d Cir. 2003). The plaintiff has noted her withdrawal of her Title VII claims against the individual defendants and that claim is deemed dismissed.

**Hostile Work Environment:**

The District next argues that Alexander cannot establish liability for her Title VII hostile work environment claim against it. An employer will not be vicariously liable for a hostile work environment where it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and where "the plaintiff employee . . . unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer to avoid harm . . ." *Faragher v. City of Boca Raton,* 524 U.S. 775, 806-07 (1998). Here, they say, they satisfy both prongs of the *Faragher* test and are not liable.

 Reasonable Care: Whether an employer has a sexual harassment policy is an "important consideration in determining whether an employer has satisfied" the first prong of the *Faragher* defense. *Duviella v. Counseling Service of Eastern Dist. of NY,* 52 Fed. Appx. 152, 153 (2d Cir. 2002). Some courts have found that where an employer has implemented a sexual harassment policy and has advised its employees of the policy, the first *Faragher* prong will be satisfied. *Wahlstrom v. Metro-North Commuter Rail Co.,* 89 F. Supp. 2d 506, 523 (S.D.N.Y. 2000). Here, the District has established that it adopted a sexual harassment policy and distributed it to its

employees in 1997 and 2002. *See* Ex. F. Both Alexander and Powell acknowledged receipt of the policy. *See* Exs. G & H. The policy provided that employees should make complaints of sexual harassment to the Title IX officer and to their immediate supervisor, but where the immediate supervisor is the harasser, the employee may complain to "the next level of management." Ex. F at 3. The policy also provided that, upon receipt of a complaint, "a prompt, thorough and impartial investigation of the allegations must follow." *Id.* at 4. The plaintiff argues that "the mere existence of a sexual harassment complaint procedure does not immunize the defendant." DE[56-14] at 7 (citing *Crisonino v. New York Housing Auth.,* 985 F. Supp. 385, 390 (S.D.N.Y. 1997). While that may be true, the mere existence of the policy here is not the sole evidence of the District's reasonable care, as discussed *infra,* and I do not rely on its existence and distribution as the sole basis for finding reasonable care, although it was an essential part of that reasonable care.

The plaintiff also argues that the policy was ineffectual because it would have required her to report the harassment to the harasser. But, as noted, the policy itself provided for that eventuality. In any event, Alexander made her complaint to her union president, who relayed it to Root, who had hired the outside investigator for the Maldonado claim, who then also investigated Alexander's claim.

Alexander further argues that the District did not exercise reasonable care to prevent and correct harassing behavior because "once an employer has notice of a hostile work environment it has a duty to take reasonable steps to eradicate it," and the District here was on notice and did nothing. DE[56-14] at 6 (citing *Murray v. New York University College of Dentistry,* 57 F.3d 243, 249 (2d Cir. 1995). The gravamen of the plaintiff's argument in this regard - that is, that the

District could have prevented Powell's harassment of Alexander and did not - is her claim that the District was on notice of a hostile work environment as early as 2005 from the complaints of Sheila Scott-Powell, and in 2006 from the complaints of Josephine Hall, but did nothing to prevent and correct those situations. Indeed, the plaintiff argues, the District covered up Powell's wrongdoing and thus encouraged him to continue harassing his subordinates, creating an atmosphere of fear and intimidation. DE[56-14] at 6. She also alleges that the District "sanitized" Powell's file and that both Scott-Powell and Hall were transferred in retaliation for complaining. *Id*. These allegations are, however, based to a marked extent on the plaintiff's *beliefs* about what happened or why and not on evidence in the record. The facts as alleged by the defendants and supported by evidence in the record, facts that have been deemed admitted as explained *supra*, reflect that Clark-Snead followed up on Scott-Powell's complaints, transferred Scott-Powell to protect her seniority and privacy, and that Scott-Powell was satisfied with the way the situation was handled.

In her report, Bronwyn Black found that Scott-Powell had complained to Michael Burger about Powell harassing her, but never made a formal complaint "because the matter was resolved when she was transferred to the High School with her consent. She stated that she just needed to get away from the Principal and she knew that she could not bear to be near him in any way." Although she lost her chairmanship and its attendant financial benefits, Black reports, Scott-Powell "is happy at the High School and has no problems since she has been there.." Ex. Z at 14-15.

The plaintiff has not submitted statements from either Scott-Powell or Hall to contradict the facts asserted by the District or found by Ms. Black, facts that do not lead to material issue of

fact as to whether the District exercised reasonable care in light of the Scott-Powell and Hall incidents. Nor did Alexander, in her counterstatement, referenced any other evidentiary support for her denials of those facts supporting a finding of reasonable care. To the extent that the declarations/affidavits of Michael Burger and Lisa Maldonado refer to Ms. Scott-Powell or Ms. Hall, their comments are either inconsistent with earlier testimony, not based on personal knowledge, based on hearsay and conjecture, or irrelevant. As to Ms. Hall, there is no evidence that Hall ever made a complaint to anyone but Powell and no accusations about Powell himself, only about a student. As noted, the outside investigator, Ms. Black, reviewed the Scott-Powell and Hall situations in early 2009, but nothing in her findings raises an issue of fact as to whether the District should have known from those situations that Powell would harass other women or that the District failed to handle those situations in a satisfactory manner. Thus, nothing in the Scott-Powell or Hall situations raises an issue of material fact regarding the District's reasonable care to prevent and promptly correct any sexually harassing behavior.

As to the complaints by the plaintiff herself and Lisa Maldonado, a plaintiff in a separate lawsuit, the District promptly hired an independent investigator, brought §3020-a claims against Powell and fired him. Alexander appears to argue that the District itself did not do enough, but its hiring of the outside investigator and subsequent termination of Powell amounted to "reasonable care to prevent and correct promptly [Powell's] sexually harassing behavior." "The reasonableness of an employer's response must be assessed based on the totality of the circumstances," and summary judgment is proper where an employer has taken "prompt and appropriate corrective action" with regard to an employee's complaint. *Wahlstrom,* 89 F. Supp. 2d at 525. Here, the totality of the circumstances boils down to the following established and

material facts: (1) Alexander first complained about Powell to her union president, Michael Burger, in November 2008 after Maldonado had come forward with her complaint earlier that same month; (2) defendant Root concluded, in a memo dated December 2, 2008 regarding the Maldonado situation, that both Maldonado and Powell appeared credible and that an outside investigator should be retained; (3) the District hired attorney Black to investigate the Maldonado claim and, because at that point Alexander had also come forward with her complaint, Black investigated the Alexander claim as well; (4) Black completed her investigation on February 9, 2009 and submitted her report, finding the women's complaints to be more credible than Powell's denials and recommending that the District follow the appropriate proceedings in a matter in which there is a finding of sexual harassment; (5) after receiving the Black report, the District suspended Powell, who never returned to work after February 2009, and began §3020-a proceedings; (6) Black submitted a supplemental report in May 2009, based on Powell's claim that there were additional witnesses, and reached the same conclusions as in the earlier report; (7) the §3020-a hearing officer ultimately found that Powell committed the acts complained of, and Powell was terminated. The bottom line is that Alexander complained about Powell in November 2008 and by February 2009 he was out of the school. The District exercised reasonable care, and the plaintiff has not raised any issue of material fact regarding that issue.

Plaintiff's Alleged Failure to Avoid Harm:

As set forth *supra*, Alexander alleges that Powell's harassing acts began in 2005 and continued until August 2008, but she did not complain until November 2008, when Maldonado "opened the door" and Alexander followed her through it. Alexander says that she did not complain sooner because she was afraid of what the District would do to her, and that the District

22

had transferred both Scott-Powell and Hall as punishment for complaining about sexual harassment and she feared she would be transferred as well. But Alexander also told Michael Burger that she did not come forward sooner because, as an African American woman, she was reluctant to see the reputation of an African-American male, Powell, tarnished. *See* Ex. JJ at 70, 79.

To the extent that fear of transfer kept Alexander from taking advantage of the sexual harassment policy and procedures sooner, the Second Circuit has held that general apprehension is insufficient to establish that a plaintiff's failure to take timely advantage of such a policy was reasonable. *See Leopold v. Baccarat, Inc.,* 239 F.3d 243, 246 (2d Cir. 2001). Further, while Alexander might have believed that Scott-Powell and Hall were transferred as punishment for raising sexual harassment issues, there is no evidence to support that conclusion. Indeed, the admitted facts show that Scott-Powell asked for and was pleased with her transfer. As to Hall, as noted earlier, there is no evidence that she ever complained that Powell sexually harassed her, only that a student had done so and she was not pleased with the way Powell handled the situation. Hall also apparently agreed to be reassigned and has since received tenure in her new position. The Second Circuit has also found that a general claim that a co-worker's complaint of sexual harassment was not taken seriously was insufficient as a matter of law to establish that the plaintiff's fear was reasonable. *Id.* at 246. a "credible fear must be based on more than the employee's subjective belief." *Id.*

As noted earlier, Alexander also states that she delayed reporting the alleged harassment because she was reluctant to see an African American man's reputation tarnished. Such reluctance, however well-intentioned, does not, however, avoid the finding that Alexander

23

unreasonably delayed.  She chose not to take advantage of the "preventive or corrective opportunities provided by the employer to avoid harm" and the District cannot be held liable under that circumstance.

I find that the District has established both prongs of the *Faragher* test and that the plaintiff has not raised any issues of material fact to prevent entry of summary judgment on the hostile work environment claim.  Thus, that claim is dismissed as against the District pursuant to the plaintiff's Title VII claim and pursuant to the implied claim[5] in the Complaint pursuant to the New York Human Rights Law, N.Y. Exec. Law §296.

The *Faragher* defense applies to both Title VII and the state law claim.  *See, e.g., Ferraro v. Kellwood Co.,* 440 F.3d 96, 102 (2d Cir. 2006); *Barnum v. New York City Transit Auth.,* 62 A.D.3d 736, 738 (2d Dep't 2009), *abrogated on other grounds by Nelson v. HSBC Bank USA,* 87 A.D.3d 995 (2d Dep't 2011).  The issue of whether the *Faragher* defense applies to New York City Human Rights Law, as opposed to the state law, has been answered in the negative by the New York Court of Appeals in *Zakrzewska v. The New School,* 14 N.Y.3d 469 (2010).  That decision makes clear, however, that although the NYCHRL provision at issue parallels Executive Law §296 in many ways, the City code has unique provisions, not found in the state law, that

_____

[5]Although the causes of action for sexual harassment and hostile work environment do not specify that they are brought under both Title VII and §296 of the state law, the Complaint does reference the state law in the first paragraph, and I have construed the NYHRL claims as having been brought in the Complaint for purposes of the summary judgment motions inasmuch as Alexander references section 296 in the first paragraph of the Complaint.  And, both the District Defendants and Powell, as well as the plaintiff, address §296 in their legal arguments.  The plaintiff also references the Fourteenth Amendment and section 1981 in the Complaint's first paragraph, but nothing in the Complaint even remotely suggests any claim pursuant to those areas of law.  Indeed, the papers suggest that Alexander has "withdrawn" her section 1981 claim, although there is no such claim. Thus, there is no discussion of any claims pursuant to the Fourteenth Amendment of section 1981.

prevent the application of *Faragher* to it. The same is not true of §296, and, here, the successful *Faragher* defense applies both to the Title VII and §296 claims.

**Quid Pro Quo Claim:**

Alexander also makes a claim of quid pro quo sexual harassment under Title VII and the New York Human Rights Law.  Quid pro quo sexual harassment occurs "when submission to or rejection of improper or unwelcome sexual conduct by an individual is used as the basis for employment decisions affecting such individual."  *Clarke v. Pacifica Foundation, WBAI,* 2011 WL 4356085, *9 (E.D.N.Y. Sept. 16, 2011)(citations and internal punctuation marks omitted). "In addition to showing that she was subjected to unwelcome sexual advances, a plaintiff seeking to state a claim of quid pro quo sexual harassment must also demonstrate a tangible employment action, i.e., that an explicit . . . alteration[] in the terms or conditions of employment resulted from her refusal to submit to . . . sexual advances." *Id.*  "Tangible employment actions" include "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Id.* (citing *Schiano v. Quality Payroll Sys., Inc.,* 445 F.3d, 597, 604 (2d Cir. 2006)).

Alexander appears to assert that Powell's attempts to kiss her, coupled with a suggestion that they could "work out" a complaint against her, his attempt to place her in the MARS program, and the District's planned transfer of her amount to "tangible employment actions." *See* DE[56-14] at 12-15.  They do not. If a quid pro quo claim "involves only unfulfilled threats, it should be classified as a hostile work environment claim . . . For a plaintiff to succeed on a quid pro quo claim, she must not only show that a threat was made but also that a tangible

25

employment action, i.e., an explicit alteration in the terms or conditions of employment, resulted from her refusal to submit to the employer's sexual advances." *Brown v. City of New York,* 2011 WL 2693677, *6 (S.D.N.Y. July 11, 2011)(citations and internal punctuation omitted).   Here, neither the placement in the MARS program nor the transfer ever actually occurred, and those incidents do not rise to the level of tangible employment actions in Alexander's quid pro quo claim against the District Defendants.  The same is true of the proposed transfer, which was never effectuated.  Further, there is no evidence whatsoever that the threat of transfer was in any way causally connected to anything Powell did or said.  He was on suspension when the transfer was proposed and played no role in it.

The plaintiff argues that "Powell linked tangible job benefits to the acceptance or rejection of sexual advances, in that he made sexual advances to her, then said he could "work out" the adverse employment action." DE[56-14] at 15.  But it is entirely unclear what adverse employment action the plaintiff is referring to and the court cannot infer any such action from the record before it.  Thus, the quid pro quo claim against the District Defendants is dismissed as a matter of law.

**Retaliation Claim:**

As a threshold matter, I note that the Complaint does not set forth a retaliation claim under either federal or state law.  I will, however, address such a claim, since it is addressed by the movants and because, even if the plaintiff had expressly made such a claim, it would be dismissed on the record before the court, in that she did not suffer an adverse employment action. To demonstrate a prima facie Title VII retaliation claim, a plaintiff must show that: (1) she participated in a protected activity; (2) she suffered an adverse employment action; and (3) a

causal connection between the protected activity and the adverse employment action. *Holt,* 95 F.3d at 130.  Here, the protected activity is Alexander's complaint in November 2008. Alexander argues that after her complaint to the District, she was retaliated against "in that she was excluded from meetings, unfairly given write ups, her evaluations were being manipulated, and she was unfairly reprimanded for various other acts."  DE[56-14] at 15-16.  These events, assuming they happened, do not rise to the level of adverse employment actions for Title VII retaliation purposes.

An "adverse employment action" for Title VII claim purposes is a "materially adverse change in the terms and conditions of employment."  *Galabya v. New York City Bd. of Ed.,* 202 F.3d 636, 640 (2d Cir. 2000).  A change in working conditions is materially adverse if it is "more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Id.*  Examples are "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices. . . unique to a particular situation."  *Id.*  The employment action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Id.*  The Supreme Court has included "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Burlington Indus. Inc. v. Ellerth,* 524 U.S. 742, 761 (1998).  Notably, "not everything that makes an employee unhappy is an actionable adverse action."  *Phillips v. Bowen,* 278 F.3d 103, 117 (2d Cir. 2002).

The proposed transfer does not qualify as an adverse action, because the mere threat of a transfer is not enough, and, even if it were, many courts have found that a lateral transfer without loss of salary or benefits does not support a Title VII claim.  *See, e.g., Gentile v. Potter,* 509 F.

Supp. 2d 221, 242 (E.D.N.Y. 2007); *Dillon v. Morano,* 497 F.3d 247, 254 (2d Cir. 2007).

Further, reprimands that do not lead to materially adverse employment consequences are not

actionable forms of retaliation. *Gentile,* 509 F. Supp. 2d at 242; *Regis v. Metropolitan Jewish*

*Geriatric Ctr.,* 2000 WL 264336, *8 (E.D.N.Y. Jan. 11, 2000)(disciplinary memoranda and

evaluations do not constitute adverse employment actions unless they affect "ultimate

employment decisions such as promotion, wages, or termination"); *Lucenti v. Potter,* 432 F.

Supp. 2d 347, 364 (S.D.N.Y. 2006)("Reprimands, threats of disciplinary action, and excessive

scrutiny do not constitute adverse employment actions. . .").

 Because the record shows that the plaintiff did not lose any seniority, salary or benefits

because of the proposed transfer or any other action, and she has not identified any adverse action

that would establish her prima facie case, her retaliation claims, to the extent that she made any,

must be dismissed, and I need not address the other retaliation factors of causation or the

existence of legitimate, non-discriminatory reasons.

**Sufficiency of Plaintiff's Notice of Claim**:

 The District Defendants next argue that Alexander's Notice of Claim was insufficient as

to the pleaded state law claims and that those claims - for intentional infliction of emotional

distress, negligent infliction of emotional distress and "respondeat superior" - must thus be

dismissed.

 As a threshold issue, the state law claims against the three individual District Defendants -

Root, Clark-Snead and Spencer- must be dismissed as a matter of law because they are not named

in the Notice of Claim. *See* Ex. NN. The only individual who is named is Darnel Powell.

"'General Municipal Law §50-e makes unauthorized an action against individuals who have not

been named in a notice of claim . . .'" *Rateau v. City of New York,* 2009 WL 3148765, * 15

(E.D.N.Y. Sept. 29, 2009) (quoting *Tannenbaum v. City of New York,* 30 A.D.3d 357, 358 (1st

Dep't 2006).  To the extent the plaintiff intended a §296 claim against the individual District

defendants, that claim must also fail because they were not named in the Notice of Claim, and

claims pursuant to the HRL, including §296 claims, are subject to the Notice of Claim

requirement.  *See Kushner v. Valenti,* 285 F. Supp. 314, 316 (E.D.N.Y. 2003); *Scaggs v. New*

*York Dep't of Educ.,* 2007 WL 1456221, *20 (E.D.N.Y. May 16, 2007)(also stating exceptions

that are inapplicable here).  The state law claims against the individual district defendants, to the

extent they are set forth in the Second, Third and Fifth[6] causes of action, are thus dismissed as a

matter of law.

The claims as against the District, however, are sufficient to satisfy the requirements of

New York Municipal Law §50-e, albeit barely.  New York Education Law §3813 mandates that

no action may be brought against a school district unless its board of education has first been

served with a notice of claim that complies with 50-e.  The purpose of the notice of claim

requirement is to afford the municipal entity or school district an "adequate opportunity to

investigate the claim in a timely and efficient manner and, where appropriate, to settle claims

without the expense and risks of litigation."  *Fincher v. County of Westchester,* 979 F. Supp. 989,

1002 (S.D.N.Y. Sept. 26, 1997)(citing *Brown v. New York City Transit Auth.,* 568 A.D.2d 178,

180 (1st Dep't 1991)).  The notice of claim requirements apply to tort claims brought as pendent

claims in a federal civil rights action.  *Id.*  (citations omitted).  Generally, the test of a notice of

---

[6]As noted *infra*, the Fifth Cause of Action, for "respondeat superior," is not a cause of
action at all, but a theory of liability that must attach to a separate claim.

claim's sufficiency is "whether it includes enough information to enable the municipality to investigate the claim adequately. . . [and] [m]erely providing notice of the occurrence is not adequate to constitute notice of a particular claim." *Id.* (citations omitted) "The fact that a cause of action not mentioned in a notice of claim arises out of the same incident as enumerated claims 'is not pivotal; rather the nature of the claim and the theory of liability are determinative.'" *Id.* at 1002-03 (quoting *Wanczowski v. City of New York*, 186 A.D.2d 397, 397 (1ˢᵗ Dep't 1992) (additional citations omitted)). "Any cause of action not directly or indirectly mentioned in the notice of claim may not be included in a subsequent lawsuit." *Id.* at 1003(citations omitted). The *Fincher* court notes that although some courts have applied the notice requirements flexibly, "their more liberal application of §50-e has not been followed by the substantial majority of cases that have addressed the issue." *Id.* at 1003, n.7.

I turn to a consideration of whether Alexander's Notice of Claim "indirectly mentioned" the infliction of emotional harm causes of action so as to give the District notice to investigate such claims. Alexander states in her Notice that by "virtue of the sexual harassment by the principal of the school in the School District where the Claimant works, and the retaliation of the principal and the School District, the Claimant has suffered loss of self esteem and emotional stress, has been subjected to a hostile work environment, retaliation . . . and was involuntarily transferred from her position as a sixth grade teacher in the Westbury Middle School to an undesired position as a first or second grade teacher in an elementary school." Ex. NN, at ¶5. I find that her reference to "a loss of self esteem and emotional stress" indirectly suggests the negligent and intentional infliction of emotional distress causes of action as against the District, and those causes of action are not dismissed on the ground of insufficiency in the Notice of Claim

although they are dismissed on other grounds.

**Intentional Infliction of Emotional Distress:**

The District argues that the claim for Intentional Infliction of Emotional Distress should be dismissed on other grounds, as well. I agree. To prevail on this claim, Alexander must prove that the defendants (1) engaged in extreme and outrageous conduct; (2) with the intent to cause severe emotional distress; (3) with a causal connection between the conduct and the injury; and (4) severe emotional distress. *Perks v. Town of Huntington,* 96 F. Supp. 2d 222, 230 (E.D.N.Y. 2000). There is no liability unless the conduct complained of "'has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.'" *Id*. at 230 (quoting *Howell v. New York Post Co.,* 81 N.Y.2d 115, 122 (1993)). Courts have "rarely recognized" a claim for intentional infliction of emotional distress in an employment context, and when they have, the claim also included a claim of sexual battery. *Id.* at 231 (citations omitted). Claims of sexual harassment and retaliatory conduct do not meet this stringent standard. *Burrell v. City University of New York,* 995 F. Supp. 398, 416 (S.D.N.Y. 1998). The factual claims against the District Defendants do not even come close to the level needed to make out a claim of intentional infliction. Their behavior was not, as a matter of law, extreme or outrageous.

And, assuming for purposes of the District's motion that the allegations regarding Powell can be read to imply an allegation of sexual battery and that the claim for intentional infliction of emotional distress presents issue of material fact that must go to the jury, the claim could only stand against the District if it might be liable on a theory of respondeat superior. But it could not be found liable on that theory. As the plaintiff herself argues, an employer can be held liable for

an employee's intentional torts if the employee was acting withing the scope of his employment when he committed the tort. *See* DE[56-14] at 21 (citing *Girden v, Sandals Int'l,* 262 F.3d 195, 205 (2d Cir. 2001)). Whether an employee was acting within that scope at a particular time is a fact-intensive inquiry. *Id.* While the ultimate determination of the issue is usually one for the jury, it can be made as a matter of law in some instances, and many New York cases have found that an employer was not responsible for sexual assault because such an attack was outside the scope of the employee's duties. *Id.* at 205-06 (citations omitted). Here, any behavior by Powell that arguably amounts to sexual battery[7], a necessary element of the claim in the employment context, would fall outside the scope of employment as a matter of law, even if the behavior occurred during work hours. *See Wait v. Beck's North America, Inc.,* 241 F. Supp. 2d 172, 181-82 (N.D.N.Y. 2003)(citing cases). The claim for intentional infliction of emotional distress as against the District is dismissed.

**Negligent Infliction of Emotional Distress:**

The defendants next argue that the claim for negligent infliction of emotional distress should be dismissed. A cause of action for negligent infliction of emotional distress may only lie where a defendant owes a "special duty" to the plaintiff, and an employer does not owe a special duty to an individual employee, because it has an obligation to treat all employees in the same manner. *Cucchi v. New York City Off-track Betting Corp.,* 818 F. Supp. 647, 656 (S.D.N.Y. 1993). The claim should be dismissed on that ground, and also because the plaintiff has

---

[7]I am guessing that Alexander would make the argument that some of Powell's behavior amounted to sexual battery, although she does not explicitly make that claim in her Complaint, nor make that argument in opposition to the motion. I touch on it here to have as complete a record as possible of my consideration of the issues presented. As noted earlier, I am not ruling on the issue, which will be determined by the state court.

abandoned the claim by her failure to oppose the District Defendant's argument that it should be dismissed[8]. Where a defendant moves for summary judgment, and the opposing party fails to oppose the argument, courts will deem the claim abandoned and grant dismissal. *See Taylor v. City of New York,* 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003); *Oparaji v. Atlantic Container Line,* 2008 WL 4054412, *12 (S.D.N.Y. Aug. 28, 2008). The claim for negligent infliction of emotional distress against the District is dismissed.

**Respondeat Superior:**

The District argues that the cause of action for respondeat superior should be dismissed as abandoned, which is true, but another ground also exists for its dismissal as a cause of action. Respondeat superior is not an independent cause of action, but a theory that must attach to an underlying claim. *See Rateau,* 2009 WL 3148765 at *15; *Farb v. Baldwin Free School District*, CV 05-596, DE[37] (E.D.N.Y. Mar. 3, 2006) (citing *Harsco Corp. v. Sequi,* 91 F.3d 337 (2d Cir. 1996). Thus, to the extent that "respondeat superior" is set forth as an independent cause of action, it is dismissed.

**Claims Against the Defendant Board of Education:**

The District argues that claims against the Board of Education must be dismissed as duplicative, because there is no legal distinction between the District and the Board under New York law. Although the District cites to definitions in state law that appear to support this argument, and the plaintiff relies on inadmissible hearsay in opposition to it, I will not dismiss on this ground. The District has presented no case law in support of the dismissal, and I decline to dismiss on the ground presented, inasmuch as the claims have all been dismissed on separate

---

[8]It would appear that the plaintiff has "withdrawn" this claim and it is deemed dismissed.

grounds.

**Qualified Immunity:**

Because all of the claims against the District Defendants are dismissed on separate

grounds, I decline to consider their arguments in favor of qualified immunity.

I turn next to the motion for summary judgment by defendant Darnel Powell.

## II) Darnel Powell's Motion for Summary Judgment

Individual defendant Darnel Powell also moves for summary judgment on all claims

against him. DE[47]. In his citations to evidence, Powell relies on the exhibits submitted by the

District Defendants. The plaintiff relies on her exhibits submitted in opposition to the District

defendants' motion.

**Rule 56.1 Statement and Counterstatement:**

Alexander's counterstatement to Powell's 56.1 Statement contains unsupported denials

similar to those in her counterstatement to the District Defendants' motion. Where evidence in

opposition to Powell's statements is indicated, it is noted. The issue of whether Powell actually

did or said the things Alexander accuses him of, allegedly amounting to sexual harassment and/or

creating a hostile work environment is not at issue on this motion, although Powell does deny the

allegations.

**Individual Liability Under Title VII:**

Powell correctly argues that, as an individual, he cannot be liable under Title VII. DE[47-

5] at 2 (citing *Sassman v. Gamache,* 566 F.3d 307, 315 (2d Cir. 2009)). The plaintiff notes that

she has withdrawn her Title VII claim against Powell and that claim is deemed dismissed.

**Supplemental Jurisdiction over Remaining State Law Claim:**

With the Title VII claim abandoned, the remaining claims against Powell set forth in the Complaint are all based on state law. Powell argues that this court should decline to exercise supplemental jurisdiction over those claims. I will exercise that jurisdiction for purposes of deciding this motion for summary judgment, but decline to exercise it in regard to the remaining state law claims against Powell based on HRL §296(1) and intentional infliction of emotional harm, as explained *infra*.

**New York Human Rights Law Claim against Powell:**

"Discrimination and retaliation claims brought under The New York Human Rights Law ("HRL") are evaluated identically to claims brought under Title VII, except in one notable respect." *Maher v. Alliance Mortgage Banking Corp.,* 650 F. Supp. 2d 249, 259 (citations omitted). While there can be no individual liability under Title VII, the HRL recognizes claims for individual liability brought against: (1) employers (N.Y. Exec. Law §296.1) or (2) persons who aid, abet, incite, compel or coerce the commission of a violation by an employer (N.Y. Exec. Law §296.6). Alexander appears to argue that Powell is potentially liable under either provision. I note as a threshold issue the unsettled state of the interpretation of §296 in the state and federal courts, especially as to the applicability of aiding and abetting liability under §296.6. I discuss those issues as they arise, *infra*.

Powell's liability as an "employer" under §296(1):

The New York Court of Appeals has held that an individual may not be subject to suit as an employer under §296.1 if he or she "is not shown to have any ownership interest or any power to do more than carry out personnel decisions made by others." *Patrowich v. Chemical Bank,* 63

N.Y.2d 541, 542 (1984). Some courts have adopted an "economic reality" test for determining whether a defendant has the "power to do more than carry out personnel decisions made by others" and is thus an employer for purposes of §296(1). They look to whether the defendant (1) had the power to hire and fire employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; or (4) maintained employment records. *See Maher,* 650 F. Supp. 2d at 260; *Dantuono v. Davis Vision, Inc.,* 2009 WL 5196151, *10 (E.D.N.Y. Dec. 29, 2009). No one factor is determinative, but economic reality is based on all the circumstances. *Herman v. RSR Sec. Servs., Ltd.* 172 F.3d 132, 139 (2d Cir. 1999). At least one court, however, has focused on the first factor, finding that the "'power to do more than carry out personnel decisions made by others' essentially amounts to the authority 'to hire or fire' people." *Pellegrini v. Sovereign Hotels, Inc.,* 740 F. Supp.2d 344, 355-56 (N.D.N.Y. 2010)(citing *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1317 (2d Cir. 1995), *abrogated on other grounds by Burlington Indus. v. Ellerth,* 524 U.S. 742 (1998) & *Faragher v. City of Boca Raton,* 524 U.S. 775 (1998)).

Powell argues that, to the extent he is being sued under the HRL as Alexander's employer, the claim must be dismissed because he was not her employer. He argues that he did not have sole authority to hire and fire but could only make recommendations to the Superintendent; that the District, not he, controlled employee work schedules and conditions of employment; and that he did not determine the rate of pay for any employee. DE[46-5] at 4. In his main brief, he does not deny maintaining employee records, but says in his reply brief that he did not personally maintain any employment records. *See* DE[49] at 5. In opposition to these assertions, Alexander makes the factually inaccurate claims that "defendant Powell hired plaintiff and had the power to

get her fired" and that he "had the power to control whether or not plaintiff received tenure and ultimately if she would be granted her coaching job." DE[48-3] at 4-5. Alexander was hired in 1993 and received tenure in 1995. Powell was hired in 2003, and clearly did not hire Alexander or control her tenure. Nor is there any indication that Alexander sought a coaching position. I assume those factual references pertain to Lisa Maldonado. They do not apply to Alexander, and Alexander does not point to any evidence that raises issues of material fact as to the economic reality issues pertaining to her.

Even assuming that her allegations about Maldonado - that Powell had the power to hire and fire and to control schedules and conditions of employment (and Powell himself does not comment on the factual inaccuracy of Alexander's argument) - apply equally to Alexander, she does not point to evidentiary support for those factual allegations. Powell, however, argues only that he did not have the "sole" authority to fire Alexander. *See* DE[47-5] at 4; DE[49] at 4. Rather, Powell maintains, he could only make a recommendation to the Superintendent, and the District made the final determination as to personnel actions. DE DE[47-3], Powell Decl., ¶12. This leaves open the possibility that he could have played some role in whether she was fired. Further, it is difficult to accept the bare allegation that the principal of a middle school did not have significant control over "conditions of employment." These allegations, based only on Powell's own declaration, do not satisfy his burden on this motion for summary judgment. Material issues of fact exist as to whether Powell can be considered an employer under §296(1).

Powell's Liability Under §296(6)

Alexander argues further that Powell is liable under section 296(6) of the Human Rights Law, which imposes liability on individuals who "aid, abet, incite, compel or coerce the doing of

any of the acts forbidden" under that law, without the requirement that the individual be an employer. Construing that provision, the Second Circuit has found that a "defendant who actually participates in the conduct giving rise to a discrimination claim may be held personally liable." *Tomka,* 66 F.3d at 1317. Other courts, including the Second Department, have disagreed with *Tomka*, while the First Department does agree. *Compare Trovato v. Air Express International,* 238 A.D.2d 333 (2d Dep't 1997)(no aiding and abetting liability); *with Steadman v. Sinclair,* 223 A.D.2d 392 (1ˢᵗ Dep't 1996)(finding individual aiding and abetting liability). The majority of federal courts to consider the issue have found that *Tomka* is controlling law and have followed its holding, and the Second Circuit has adhered to its holding in later decisions. *See Feingold v. New York,* 366 F.3d 138, 161 n.19 (2d Cir. 2004)(recognizing disagreement in state courts and noting that "majority of courts that have considered the issue have affirmed the existence of a cause of action against individual defendants under the aid-or-abet provision of the NYSHRL" and citing cases).

I recognize that *Tomka* is controlling law in this District, and that courts in this District must read §296(6) to allow for individual liability on the basis of aiding and abetting, a finding which I not only must follow, but with which I agree. This case, however, presents a situation not considered by *Tomka* - one in which the only individual defendant against whom the claim can be brought is the alleged primary harasser, and in which the employer, the District, is not liable pursuant to the *Faragher* defense. Thus, the issues presented are whether, under §296: (1) an individual can aid and abet his own conduct, and (2) an individual can be liable under §296(6) in the absence of the liability of an employer. Some courts have found that an individual can aid and abet his own behavior. *See, e.g., Tully Boone v. North Shore - Long Island Jewish Hosp. Sys.,*

38

588 F. Supp. 2d 419, 427 (E.D.N.Y. 2008); *Maher v. Alliance Mortgage Banking Corp.,* 650 F. Supp. 2d 249, 262-263 (E.D.N.Y. 2009). Other courts have ruled in the negative. *See Hicks v. IBM,* 44 F. Supp. 2d 593, 600 (S.D.N.Y. 2000). I am not inclined to agree that an individual can aid and abet himself, nor do I read *Tomka* to require or even suggest such a conclusion. Several individuals were involved in the *Tomka* matter, not one, and the court had no reason to consider the issue of whether an individual can aid and abet himself. I need not rule on the issue in order to dismiss Alexander's putative aiding and abetting claim, however, because the absence of any employer liability demands that result.

Like Title VII, §296 is, in essence, an *employment* discrimination statute, not an individual liability statute, even though individuals can, as noted, be liable under some circumstances. "Importantly, since it is the employer's participation in the discriminatory practice which serves as the predicate for the imposition of liability on others for aiding and abetting, a plaintiff cannot prevail against an individual on her state claims unless she can first establish the liability of her employer." *Pellegrini v. Sovereign Hotels, Inc.,* 740 F. Supp. 2d 344, 356 (N.D.N.Y. 2010)(internal citations and punctuation marks omitted); *see also Jordan v. Cayuga County,* 2004 WL 437459, *4 (N.D.N.Y. 2004)(plaintiff may only recover under §296(6) where she can show that defendant aided or abetted primary violation of NYHRL committed by another employee or the business itself). Here, there is no liability on the employer District's part, and thus any claim by Alexander based on §296(6) must fail must fail on that basis.

**Sufficiency of Plaintiff's Notice of Claim:**

Powell argues that deficiencies in Alexander's notice of claim require dismissal of her additional state law claims for negligent and intentional infliction of emotional distress. Plaintiff

has withdrawn her negligent infliction of emotional distress claim.  To the extent that Alexander

has brought an intentional infliction of emotional distress claim against Powell in his official

capacity as former principal, that claim need not be dismissed based on insufficiency of the Notice

of Claim.  Powell is expressly named in the notice, as is Alexander's emotional distress, and

although she did not specify a cause of action for intentional infliction, I find that the Notice of

Claim suffices, albeit barely, for that claim to survive[9].  In any event, I have found that if the

conduct allegedly engaged in by Powell was, if proven, not within the scope of his employment

and the District cannot be held liable, so the Notice of Claim is irrelevant.  In her Complaint,

Alexander sets forth claim for intentional infliction of emotional distress against all defendants,

including, presumably, Powell in his individual capacity.  I find that material issues of fact exist as

to that claim and deny summary judgment in that regard.

Powell's motion for summary judgment is granted as to all of the claims except the claims

pursuant to §296(1) and intentional infliction of emotional distress.

**Supplemental Jurisdiction:**

I will not exercise supplemental jurisdiction to consider the HRL §296(1) claim against

Powell, or the claim for intentional infliction of emotional harm against Powell in his individual

capacity, both of which survive this motion.  Under 28 U.S.C. §1367(c), a district court "may

decline to exercise supplemental jurisdiction over a claim . . . if (1) the claim raises a novel or

complex issue of State law . . . or (4) in exceptional circumstances, there are other compelling

reasons for declining jurisdiction."  As discussed *supra,* the law regarding §296 is far from settled.

---

[9]Alexander's opposition to Powell's argument is also taken to a great extent from papers
prepared for Lisa Maldonado, and  contains few, if any, factual averments unique to Alexander.

Although much of the controversy goes to §296(6), I find that there is sufficient complexity in the application and interpretation of §296(1) to make it more prudent for the claim to be decided by the state court.  *See Fiacco v. Christie's Inc.,* 2002 WL 257693, *3 (N.D.N.Y. Feb. 21, 2002) (declining to exercise supplemental jurisdiction over §296(6) claim and citing strict holding in *Patrowich* that individuals are liable only if they have ownership interest or supervisory authority over plaintiff).  Inasmuch as the §296(1) claim must go to the state court, the additional state law claim must go as well.

### III) Plaintiff's Motion to Amend the Complaint

The plaintiff moves to amend the complaint to "include a cause of action for Article 15 of the New York State Executive Law Section 296 et al. and 42 U.S.C. 1983."  *See* DE[50-5] at 1; DE[50], Ex. B.  The motion must be considered under both Federal Rules 15 and 16 because the motion was made after the deadlines for such motions had passed.

**Rule 16 Good Cause Requirement:**

"Rule 16(b)'s 'good cause' standard governs motions to amend filed after the deadline the court has set for amending pleadings, rather than the more liberal standard set forth in Rule 15(a) for motions to amend generally."  *Bizouati v. City of New York*, 2008 WL 753886, at *1 (E.D.N.Y. Mar. 19, 2008) (citing *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir.2000)); *see also Grochowski v. Phoenix Constr.,* 318 F.3d 80, 86 (2d Cir. 2005) (after entry of a scheduling order, "the lenient standard under Rule 15(a), which provides leave to amend 'shall be freely given,' must be balanced against the requirement under Rule 16(b) that the court's scheduling order 'shall not be modified except upon a showing of good cause'").  Here, the

deadline was first 12/1/10, later extended to 1/12/11, and the motion was made on 3/11/11[10], two months after the extended deadline had passed.  *See* DE[25] & [30].  Rule 16, by limiting the time for amendments, "is designed to offer a measure of certainty in pretrial proceedings, ensuring that at some point both the parties and the pleadings will be fixed." *Parker*, 204 F.3d at 339-40 (internal quotation marks and citations omitted).  Allowing the pleadings to be amended past the court-ordered deadline without a showing of good cause "would render scheduling orders meaningless." *Id.* (quoting *Sosa v. Airprint Sys., Inc.,* 133 F.3d 1417, 1419 (11th Cir. 1998)).  Thus, a party seeking to amend a complaint after the Rule 16(b) deadline to do so has lapsed must first establish good cause to modify that deadline.  *See Hogan v. J.P. Morgan Chase Bank,* 2008 WL 4185875, at *2 (E.D.N.Y. Sept. 4,2008).

The plaintiff argues that a change in the language of Rule 16(b)(4) in 2007 from the mandatory "shall not be modified except upon . . . good cause" to "may be modified only for good cause and with the judge's consent" is "arguably more permissive."  *See* DE[50-5] at 7.  Prior to that change, given the mandatory language of Rule 16 that a scheduling order "shall not be modified," courts held that a motion must be denied unless the plaintiff demonstrated good cause for not making his motion to amend before the deadline.  *See, e.g., Lincoln v. Potter,* 418 F. Supp. 2d 443, 454 (S.D.N.Y. 2006).  The standard was that a "finding of good cause depends on the diligence of the moving party." *Parker,* 204 F.3d at 340; *see also Grochowski,* 318 F.3d at 86; *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 244 (2d Cir. 2007) (noting that the primary consideration is whether the movant can demonstrate diligence).  Good cause has been measured

---

[10]Alexander attempted to make the motion to amend by letter on 3/2/11, but was instructed by the court that it had to made as a motion on notice.

against the diligence of the party seeking to amend the pleading and has required the movant to establish that the deadline to amend the pleading could not be met despite due diligence. *Grochowski,* 318 F.3d at 86. The plaintiff, as noted, argues that these standards may have loosened, arguing that in *Kassner*, the Second Circuit required district courts to consider factors other than the plaintiff's diligence and "left open the possibility that amendments could be permitted even where a plaintiff has not been diligent in seeking an amendment." DE[50-5] at 7. But courts have always been free to consider factors other than diligence, for example, prejudice, even where they emphasized diligence, and *Kassner,* which considered a party's right "to amend once as a matter of course at any time before a responsive pleading is served," does not change that. Indeed, *Kassner* recognized that "amendment of a pleading as a matter of course pursuant to Rule 15(a) is subject to the district court's discretion to limit the time for amendment of the pleadings in a scheduling order issued under Rule 16(b)," a holding that is not only not more permissive, but could be considered more strict. *Kassner,* 496 F.3d at 244. Thus, the prevailing standards for good cause still apply.

Here, although the plaintiff recognizes the good cause standard in her moving brief and discusses at length the application of Rule 16 to motions to amend, she makes no effort in that brief to establish or identify any cause for her delay in moving to amend, let alone good cause. She does make some effort in her reply brief to provide an explanation for the delay, but I decline to consider arguments raised for the first time on a reply brief. *See Harvey v. Bennett,* 2009 WL 2568551, *4, n.1 (arguments raised for first time in reply brief need not be considered) (citing cases); *Rowley v. City of New York,* 2005 WL 2429514, *5 (S.D.N.Y. Sept. 30, 2005)(same). And, even taking the factual allegations about a change of counsel and difficult discovery deadlines

43

into consideration, the result is the same.  Parties are bound by actions of prior counsel, even in the unfortunate circumstance here regarding the prior counsel's health.  To find good cause simply on the basis of new counsel would be "to allow a party to manufacture 'good cause at any time simply by switching counsel."  *Glover v. Jones,* 2006 WL 3207506*, *4 (W.D.N.Y. Nov. 3, 2006); *see also Holland v. Goord,* 2010 WL 3946297, *3 (W.D.N.Y. Aug. 17, 2010); *Davidowitz v. Patridge,* 2010 WL 1779279, *4 (S.D.N.Y. Apr. 23, 2010).  The plaintiff did not diligently pursue the amendment and has not shown good cause.  Significantly, good cause may not be established where the facts underlying the claim were known to the plaintiff at the time the action was filed. *See Parker,* 204 F.3d at 341; *Rush Indus., Inc. v. Garnier, LLC,* 2006 WL 4122091, at *1 (E.D.N.Y. Dec. 15, 2006); *Lincoln,* 418 F. Supp. 2d at 454.  Here, the plaintiff knew all of the relevant facts and still delayed making the motion. Further, at this stage in the proceedings, where discovery is finished and summary judgment motions have been made and now decided largely in the defendants' favor, allowing amendments would be prejudicial.  *See Cahill v. O'Donnell,* 75 F. Supp. 2d 264, 279 (S.D.N.Y. 1999).  Finally, even if Alexander had established good cause and there would be no prejudice, the amendments she proposes would be futile, as discussed *infra.*

**Rule 15 Standards:**

Rule 15(a) of the Federal Rules of Civil Procedure provides, in pertinent part, that "a party may amend [its] pleading . . . by leave of court," and that "leave shall be freely given when justice so requires."  Fed. R. Civ. P. 15(a); *see also Pangburn v. Culbertson*, 200 F.3d 65, 70 (2d Cir. 1999) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  In making its determination, the court considers factors such as undue delay, prejudice to the defendants, and futility of the proposed amendments.  *See Foman*, 371 U.S. at 182; *MacDraw, Inc. v. CIT Group Equip. Fin.,*

*Inc.*, 157 F.3d 956, 962 (2d Cir. 1998); *Harrison v. NBD, Inc.*, 990 F. Supp. 179, 185 (E.D.N.Y. 1998).  Although amendments are generally favored because "they tend to facilitate a proper decision on the merits," *Blaskiewicz v. County of Suffolk*, 29 F. Supp. 2d 134, 137 (E.D.N.Y. 1998) (citation omitted), ultimately, "it is within the sound discretion of the court whether to grant leave to amend." *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.*, 22 F.3d 458, 462 (2d Cir. 1994) (*citing Foman*, 371 U.S. at 182).  Usually, a proposed amendment is futile if it could not survive a Rule 12(b)(6) motion to dismiss for failure to state claim.  But, when a motion to amend is made in response to a summary judgment motion, the court may deny the amendment as futile when the evidence in support of the plaintiff's proposed new claim creates no triable issue of fact, even if the amended complaint would state a valid claim on its face.  *See Milanese v. Rust-Oleum Corp.,* 244 F.3d 104, 110 (2d Cir. 2001); *Stoner v. New York City Ballet CO.,* 2002 WL 523270, *23 n.10 (S.D.N.Y. Apr. 8, 2002)(denying motion to amend to add claim that "might survive a motion to dismiss" but would "immediately be subject to dismissal on a motion for summary judgment.")

Here, both of Alexander's proposed amendments are futile.  The Proposed Amended Complaint adds, as a second cause of action against all defendants, a claim for "constitutional violations and redress under 42 U.S.C. Section 1983 Retaliation and Hostile Work Environment." DE[50], Ex. B, ¶¶60-77.  As the District Defendants note, section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred."  DE[53] (citing *Baker v. McCollan,* 443 U.S. 137, 156 n.3 (1979)).  Here, the text of the section 1983 cause of action does not specify the constitutional violation or other federal right allegedly suffered by the plaintiff. Alexander describes her new claims, stating that the proposed amended

complaint would add a "State Cause of Action [under] Executive Law Section 296 and [a] 42 U.S.C. 1983 claim, for sexual harassment, hostile work environment, and retaliation." DE[50-6] at 6. But that language describes a Title VII claim, and a violation of Title VII cannot serve as the predicate constitutional or federal right for a section 1983 claim. A plaintiff may only concurrently assert a Title VII cause of action with a section 1983 cause of action "if some other law than Title VII is the source of the right alleged to have been denied." *Saulpaugh v. Monroe Comm. Hosp.,* 4 F.3d 134, 143 (2d Cir. 1993); *Geirlinger v. New York State Police,* 15 F.3d 32, 34 (2d Cir. 1994)("A Title VII plaintiff is not precluded from bringing a concurrent §1983 cause of action, so long as the §1983 cause of action is based on a distinct violation of a constitutional right.") Although the same factual allegations might, in some cases, support claims for violations of both Title VII and an independent constitutional right, that is not the case here. In her reply brief, the plaintiff states that she is making an equal protection claim, but raising that argument in the reply brief only is, as noted *supra*, not acceptable. And, even considering that claim, the proposed amended complaint is bare of the factual allegations regarding similarly situated individuals and membership in a protected class that are essential to an equal protection claim and such a claim would thus fail as futile. *See, e.g., Diesel v. Town of Lewisboro,* 232 F.3d 92, 103 (2d Cir. 2000). Further, the necessity of proving the similarly situated individuals aspect of an equal protection claim would certainly require additional discovery, despite the plaintiff's claim that no "additional or different discovery" would be needed. DE[50-6] at 5. The need to start discovery again at this stage of the litigation would be prejudicial to the defendants in that it

would cause them to expend significant additional resources to conduct discovery[11]. *See Grupke and Roberts v. Linda Lori Sportswear, Inc.* 921 F. Supp. 987, 992 (E.D.N.Y. 1996). Thus, the proposed section 1983 claim is futile.

Alexander also seeks to add facts in support a section 296 claim. As the plaintiff notes, she is not attempting to add a new §296 claim, since one was "already articulated," but to "strengthen" that claim. DE[52-1] at 1. I have interpreted the existing Complaint to contain section 296 claims against all defendants, as discussed at length *supra*, and find that the new facts would not change the dismissal of those claims, save for the §296(1) claim against Powell, as a matter of law. The claim against the District defendants is futile as a result of their successful assertion of the *Faragher* defense and Alexander's failure to name the individual District Defendants in her Notice of Claim. A §296(6) claim against Powell cannot stand because an individual cannot aid and abet himself and there is no employee liability on the part of the District. No new facts will change those findings and the claims are thus futile despite the newly alleged facts. If the plaintiff chooses to pursue her §296(1) claim against Powell in state court, she can seek permission there to amend the complaint if need be.

To the extent, if any, that the plaintiff's proposed amended complaint seeks to bolster claims for retaliation or quid pro quo discrimination, they too would be futile, for the reasons set forth *supra*.

The plaintiff's motion to amend is denied for failure to show good cause and because the

---

[11]The plaintiff's claim that the case is "still at the discovery stage" is patently wrong. See DE[50-6] at 5. Presumably, plaintiff's counsel began drafting the memo of law when that was true, but discovery in this matter closed on 2/28/11 and the motion was filed on 3/11/11. Even the earlier, rejected letter motion to amend, which was filed on 3/2/11 was filed after the deadline for making such motions and after the close of discovery.

proposed new claims would be futile.

The Clerk of the Court is directed to enter judgment accordingly.

Dated: Central Islip, New York          **SO ORDERED:**
       November 4, 2011

                              /s/ William D. Wall
                              WILLIAM D. WALL
                              United States Magistrate Judge